UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| JOSEPH E. LEICHTNAM, | Case No. 15-5012 |
| Plaintiff, | |
| vs. | PLAINTIFF'S BRIEF IN SUPPORT OF MOTION TO COMPEL |
| AMERICAN ZURICH INSURANCE COMPANY, ZURICH AMERICAN INSURANCE COMPANY, and ZURICH NORTH AMERICA, Defendants. | |

INTRODUCTION

This bad faith case arises from termination of medical care for a worker's compensation (WC) injury. Plaintiff served 26 document requests. Zurich complied with two.[1] None of Zurich's objections are supported by case law.

Zurich's objections are not signed by counsel.[2] Rule 26(g)(2) requires an attorney's signature certifying objections as "consistent with these rules and warranted by existing law." When an objection isn't certified, the Court "must strike it unless a signature is promptly supplied after the omission is called to the attorney's or the party's attention." Plaintiff brought this to Zurich's attention, and counsel have met and conferred. Plaintiff now asks for an order compelling discovery and imposing costs.

---

[1] Ex. 1.

[2] Ex. 1, p. 7.

1

**PROLOGUE**

In August 2013, the Chief Financial Officer of Zurich Insurance Group spent several days riding his mountain bike in the Swiss Alps. Then he returned home to his lakeside villa outside Zurich and killed himself. He left a note referring to the operating profit targets set by Zurich's management and his apprehension over the Chairman's intention to now signal to investors that management hadn't met those targets.[3]

Two years later, Zurich again fell short on its promises to investors.[4] Zurich's stock price fell over $100 a share – an aggregate loss of nearly $20 billion.[5] Since employee bonus pay is linked to these targets along with each employee's contribution toward meeting them,[6] Zurich's worker forfeited over $147 million in pay compared to the previous year.[7] The eleven members of Zurich's Executive Committee lost over $10 million in performance based bonuses.[8]

Zurich's Board responded by accepting the CEO's resignation.[9] A short while later he too killed himself.[10]

Why do Zurich's executives take these operating profit targets so seriously? And what does any of this have to do with Joe Leichtnam in Rapid City South Dakota?

---

[3] Ex. 3.

[4] Ex. 4.

[5] Ex. 5.

[6] Ex. 6,  p. 68; Ex. 7, p. 74

[7] Ex. 7,  p. 106.

[8] Ex. 7, p. 100.

[9] Ex. 3.

[10] *Id.*

### 1.  Zurich's Global Performance Management System

Zurich applies a "global performance management process."[11] To align the behavior of claim personnel with company targets,[12] ██████████████████████████████ ████████████████████████ Zurich's "Short Term Incentive Program" (STIP) pays bonuses up to 100% of base salary.[15] Annual Reports explain the purpose: "[*t]he key focus throughout STIP is to support achievement of the BOP* [business operating profit] *targets*." [16]

In 2009 – the year Zurich denied Joe's medical expense claim – ████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████ ██ ████████████████████████████████████ ██████ ██ ████████████████████████████

---

[11] Ex. 7, p. 82.

[12] Ex. 10.

[13] Ex. 12.

[14] Ex. 5, p. 52.

[15] Ex. 13, Ex. 7, p. 88; Ex. 5, p. 52.

[16] Ex. 7, p. 80, see also Glossary at p. 295; Ex. 5, p. 52.

[17] Ex. 12.

[18] Ex. 52.

[19] Ex. 52, at 2221.

[20] Ex. 52, at 2192.



Upper level management has even more at stake than claim personnel. The year of Joe's injury, Zurich's eleven member Executive Committee collected $38.8 million in bonuses and stock awards linked to performance targets, and their total compensation reached $57.6 million.[23] The CEO of defendant Zurich American Insurance Co. is a member of that committee.[24]

Failing to reach targets can spell the end of careers. Management sets targets to entice investors and drives stock prices up. But that only works if investors believe that management will reach them and the value of investors' stock will rise. If management fails to reach targets and share prices drop, interest in management's next round of predictions falls flat – *unless they come from new management.*

This system of rewards and penalties gives company personnel a *personal stake* in the outcome of claims. That stacks the deck against Joe and others like him.

But in this particular case, the hidden motivations go even further than that.

---

[21] Ex. 52, at 2189.
[22] Ex. 53, at 2411.
[23] Ex. 5, p. 54.
[24] Ex. 7, p. 57.

### 2.   Rommesmo's Cayman Islands Worker's Compensation System

Joe's employer, Rommesmo Co.  runs its WC program through a company in the Cayman Islands – *Raffles, Ltd.*  It works like this: Raffles operates as a "captive reinsurer," a company set up to insure only its owners. Rommesmo and other US employers then buy ownership shares in Raffles, and instead of paying hundreds of thousands in premiums each year to US insurer, they send that money to Raffles, which they co-own.[25] They still deduct the premium payments as a business expense for US income tax purposes.

Raffles then has a "fronting agreement" with Zurich.[26]  Zurich issues the actual policy and handles the claims. Raffles repays or "reinsures" Zurich.[27]

This series of transactions provides a mechanism to run millions in premiums through off-shore accounts. That takes the funds outside the reach of US regulatory oversight and US income taxes on the investment earnings generated by those funds. Raffles boasts that it gives US employers an opportunity to "*profit from what was once an operational cost.*"[28]

More importantly, Raffles promises that if injured workers don't need all of the premium money set aside to pay claims, Raffles credits funds back to Rommesmo – plus the tax free investment earnings.[29]  To increase the amount refunded, Raffles coaches ways to reduce claim pay-outs. Here are a few quotes from Raffles' materials discovered in Rommesmo's possession:

- "Be aggressive. Work with your adjuster to close claims as soon as possible (large

---

[25] Ex. 14.

[26] See *Playtex FP, Inc. v. Columbia Casualty Co.*, 609 A.2d 1087, 1091 (Del. Super.1991) (fronting arrangements often used to satisfy licensing requirements for regulatory or contractual purposes).

[27] Ex. 14; Ex. 15.

[28] Ex. 14.

[29] Ex. 14; Ex. 16.

5

> or small)."[30]

- •   "Drive your panel of doctors to release employees to transitional duty."[31]

- •   "Save Money ... if they are not in the hospital, get them back to work A.S.A.P."[32]

- •   "Control your claims so they don't control you or your company!"[33]

Raffles' coaching works. In 2012-2014 Raffles reported "loss ratios" close to half of the averages reported by the South Dakota Division of Insurance for the same time periods. Here are those statistics:

|            | 2012   | 2013   | 2014   |
|------------|--------|--------|--------|
| Raffles[34]   | 33.48% | 37.65% | 39.46% |
| Industry[35]  | 66%    | 61%    | 60%    |

### 3.  Zurich makes extra efforts to reduce claim payouts for large customers

Raffles' website says it has over 300 member companies and handles over $240 million in annual premiums.[36] In 2009 – the year it ended Joe's medical care –



---

[30] Ex. 17.
[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] Ex. 18. A "loss ratio" of 33% means that for every dollar of premium, the company paid 33 cents for claims. See, e.g., Ex. 7, Glossary.
[35] Ex. 19.
[36] https://rafflesinsurance.com/performance/
[37] Ex. 49.
[38] *Id.*



But Joe didn't know about any of this when he fell from a forklift in August 2007. So we now explain what happened to Joe.

## STATEMENT OF FACTS

### 1.   Joe's job at Dakota Steel

Joe grew up on a farm outside Presho, and graduated from Lyman County High School. In 2001 he started working at Dakota Steel in Rapid City. He managed inventory and operated heavy equipment.

Joe's work evaluations say he had *perfect work attendance,* consistently arrived on time or early, and set high personal standards for quality work. Supervisor comments described him as "*A 'Go-Getter'!!,*" ... "Very knowledgeable with all aspects of the inventory process," ... "Can always be counted on for any additional duties or tasks to be done at any time!"[40]

And in a comment that takes on special meaning as this story unfolds, his supervisor also described Joe as "*Very safety conscious.*"[41]

### 2.   The work injury.

In July 2007, Rommesmo Co., a North Dakota company, bought Dakota Steel.

---

[39] (emphasis added) Ex. 50.
[40] Ex. 20.
[41] *Id.* (emphasis added).

Rommesmo owns companies in five states.

A month later, a job superintendent from the Fargo home office came to Rapid City to direct construction of roof girders for the new Ice Arena. He climbed on a 30,000 lb. forklift but didn't maintain enough air pressure in the brake system for the brakes to function. When that happens, a safety mechanism sounds an alarm and activates the park brake, locking the machine in place until air pressure rebuilds.[42]

Joe heard the alarm and saw the frustrated manager in the cab, angrily waving his arms and shouting. Joe climbed the side steps of the forklift, pointed out the air gauge, and explained the need to rebuild air pressure. The manager increased the throttle to raise pressure. That released the park brake and the machine lurched.[43] Joe toppled off backwards.[44]

The work yard had a layer of large crushed rocks to provide a surface for heavy machinery.[45] Joe landed hard on his back. His head hit a rock, knocking him unconscious.[46]

When he regained his senses, Joe's supervisor took him to RapidCare where he received stitches in the back of his head. A large area of bruising and swelling emerged on his low back.[47] Examination revealed "foot drop," a symptom of nerve injury in the low back.[48]

---

[42] Ex. 22.

[43] Ex. 21, Joe's Dep. pp. 16-18; While irrelevant for worker's compensation purposes, the manager's version of events omits his unfamiliarity with the equipment, saying "Joe approached the machine to '*concur*' the air supply had to be rebuilt ... ." He also says Joe stood on the *bottom step – only 16 inches from the ground,* and that "[t]he forklift did not move." Ex. 22.

[44] *Id.,* See also Def. Answer, ¶ 3, Doc 11.

[45] Ex. 22, at 39.

[46] *Id.*

[47] Ex. 23.

[48] Ex. 25.

### 3.   Joe is diagnosed with sciatic nerve damage and post-concussive headaches.

An EMG later confirmed nerve damage at L5-S1.[49] In addition to low back pain, Joe also developed persistent and sometimes severe post-concussive headaches.[50]

Zurich directed Joe's care and moved him to The Rehab Doctors clinic. Over the next 12 months, six different physicians saw him and related his conditions to the work injury.[51] A neurosurgeon said Joe's nerve damage likely occurred when Joe hit the ground, and surgery wouldn't fix it.[52] He referred Joe for chronic pain management.[53]

### 4.   Zurich's adjuster decides Joe needs no further treatment and schedules an IME

When the doctors indicated that Joe might need care indefinitely, Zurich's claim adjuster decided Joe needed no further care. Notes of conversations between Rommesmo's "Safety Director" and Zurich's nurse case manager say:

> She and the analyst [adjuster] feel strongly that Joe has received enough therapy and needs to stop. They have given Joe the equipment to do the therapy at home and that is where it should be done.[54]

Since none of the doctors supported the medical opinions of Zurich's adjuster, he set up an IME. But the IME doctor also attributed Joe's conditions to the work injury, and agreed with substantially all of the treatment recommendations.[55] Zurich and Rommesmo tried to get the doctor to change his opinions by sending him prior chiropractic records showing that Joe

---

[49] Ex. 24.
[50] Ex. 27.
[51] Ex. 26.
[52] Ex. 28.
[53] *Id.*
[54] Ex. 29.
[55] Ex. 24.

attended regularly scheduled maintenance visits once a month and usually reported various aches and pains in his back (and also associated them with work activities).[56] But the IME doctor pointed out that none of those examinations detected any sign of foot drop – while every examination after the work injury did reveal foot drop – so he refused to change his report.[57]

Zurich then hired another doctor to review the records and challenge the conclusions of its IME doctor.[58] But his report also conceded that no sign of foot drop showed up until immediately after the work injury, so he couldn't attribute the nerve injury to pre-existing causes.[59] Zurich's adjuster then asked the nurse case manager if she could get the doctor to change the wording of his report.[60] That didn't happen either.

So now Zurich had *seven medical opinions* supporting Joe's claim.[61]

**5.   Zurich believes that termination for cause supports denial of WC benefits**

Joe continued working and made no claim for benefits other than medical treatment expenses. Then his wife went through a hysterectomy causing her to miss work, so to make ends meet Joe took a second job working at night and weekends.[62]

Meanwhile, Zurich's claim notes refer to Joe's continued employment at Dakota Steel as somehow inhibiting resolution of his claim, saying "Settlement Strategy: It is too early in the claim to discuss settlement and he continues to work for the insured."[63] Likewise, Zurich

---

[56] Ex. 2.
[57] Ex. 24 and claim notes therein.
[58] Ex. 31.
[59] Ex. 30; Ex. 31.
[60] Ex. 31.
[61] Ex. 26.
[62] Ex. 29, at 54.
[63] Ex. 32, at 1376.

documents provided to Joe's employer suggest that termination for cause supports denial of worker's compensation benefits.[64]

### 6. Rommesmo terminates Joe for purported safety violations

On April 1, 2009, Joe was clearing snow from the parking lot with a front end loader. Meanwhile, another employee drove a company pick-up behind the loader, and Joe backed into it. Joe's supervisor investigated, and assigned fault to the pick-up driver for failing to yield to operating machinery in the work yard.[65]  His report found no violation of safety rules by Joe.[66]

*Five days later,* on April 6, 2009, Rommesmo fired Joe.[67] Within hours, Rommesmo notified Zurich's adjuster that Joe was terminated for cause based on *safety violations*.[68]

### 7. Zurich immediately schedules Joe for an IME with Dr. Farnham

Within a week after termination, Zurich scheduled Joe for an IME with Dr. Richard Farnham.[69] Farnham claimed to be an expert in occupational medicine, but he flunked the board examinations for occupational medicine three times in a row.[70] He no longer treated patients and his medical practice consisted solely of IME work, with 90% of it done for insurance

---

[64] Ex. 33.

[65] Ex. 34, Ex. 21.

[66] *Id.*

[67] *Id.*

[68] Ex. 35; Note: Rommesmo created documentation concerning Joe's termination several years after the actual event. See Ex. 34, Ex. 21. Later claim notes also show Zurich's adjuster saying "[w]e have denied further benefit from the EE *as he was terminated for cause* and IME states ongoing is not related." Ex. 37, p. 2 (emphasis added)

[69] Ex. 36.

[70] Ex. 37.

companies.[71] Farnham performed approximately 2000 IMEs in South Dakota between 2005 and 2011.[72] That's over 360 a year.

Farnham claimed to hold two board certification in "Forensic Medicine" from the *American Board of Forensic Examiners*," and the "*American Board of Forensic Medicine."*[73] An internet search fails to locate any organization claiming either name, but Farnham's CV also lists membership in the *American College of Forensic Examiners (ACFE)* -- which <u>does</u> exist.[74] Articles and news programs such as PBS Frontline identify it as a credentialing scam set up by Robert O'Block, and say that he also issued "certifications" under a variety of names with "American Board" in them.[75] The ACFE's Facebook site includes postings using the name "American Board of Forensic Examiners" alongside the "American College of Forensic Examiners." O'Block, age 66, made the news again four months ago – in August 2017, when he killed his 27 year old girlfriend and then committed suicide.[76]

So now Joe faced an IME by "certified forensic examiner" Richard Farnham.

---

[71] Ex. 38.

[72] Ex. 37.

[73] Ex. 39.

[74] Ex. 40. An article entitled "*No Forensic Background? No Problem*" explains how the author, a journalism student with no forensic background, received certification from the ACFE as a "Forensic Consultant" after she paid $495 in fees, $165 in membership dues, watched a 90 minute video, and took an unsupervised multiple choice test on her home computer. For another $50, the ACFE also sent her a white lab coat. The ACFE also certified "Zoe E. Katz," a house cat whose owner had him certified to show how easy ACFE credentials are to obtain, and Seymour Schlager, whose certificate the ACFE mailed to him at the prison where he served time for attempted murder. See https://www.propublica.org/article/no-forensic-background-no-problem.

[75] *Id.*

[76] Ex. 41, Washington Post*, The King of Junk Science has Died,* August 31, 2017.

**8.  Farnham disagrees with seven prior medical opinions – so Zurich adopts his conclusions and terminates Joe's medical care**

Minutes after concluding his examination, Farnham told Zurich that Joe had no work related injury and needed no treatment.[77] A week later he issued a written report saying the work injury "does not remain a major contributing cause ... ."[78]

Farnham went on to say that further medical care for pain relief would not improve Joe's condition, so it wasn't reasonable or necessary.[79] That disregards decisions of both the South Dakota Supreme Court and SD Department of Labor, recognizing that medical care for pain relief is compensable under SDCL 62-4-1, regardless of whether it improves the underlying medical condition.[80]

At the end of his report, right beside his signature, Farnham included a handwritten sticky note to Zurich's adjuster asking him to pass Farnham's name on to other adjusters interested in his IME services.[81]

With Farnham's report in hand, Zurich immediately terminated Joe's medical care.[82] Zurich's claim notes say: "[w]e ended medical based on Farnham's IME. He is the only dr. [sic] who has not tied the present complaints to his employment."[83]

**9.  Zurich offers $1500 to settle Joe's claim**

After cutting off Joe's medical care, Zurich offered Joe $1500 to settle all future medical

---

[77] Ex. 42.

[78] *Id.*

[79] *Id.*

[80] Ex. 44.

[81] Ex. 43.

[82] Ex. 42, 45.

[83] Ex. 46.

benefits.[84] Joe refused.

Joe hired a lawyer and resisted the denial. Meanwhile he went without care for three years. As the prospect of a hearing approached, Zurich backed down and reinstated care.[85] The explanation for this change of heart is mostly redacted from the claim notes, but clues remain. For instance, a claim note by the claim manager asks the adjuster this perplexing question: "*What was D/A's* [defense attorney's] *reason that we could face a bad faith claim?*" [86]

## PLAINTIFF'S DOCUMENT REQUESTS

### Request No. 2 – Personnel files

> The entire personnel files (see definitions) for each person that handled or participated in handling or making decisions regarding any aspect of Plaintiff's claims, as well as those persons who supervise those individuals, as well as the persons in the direct chain of command above them, up to the Senior Vice President of Claims.[87]

Zurich's *uncertified objections* say personnel files are irrelevant and disclosure violates employee privacy rights. Zurich unilaterally limited production to employee performance reviews, and only produces those for 3 of the 14 Zurich employees involved in Joe's claim.[88] Zurich also refuses to provide  documents concerning supervisors in the chain of command. Finally, Zurich limits its response to 2008 through 2012, when it refused payment of Joe's claim.

---

[84] Ex. 51.

[85] Ex. 48.

[86] Ex. 47 (emphasis added).

[87] Ex. 1.

[88] *Id.*

**Personnel files are relevant**

Zurich cites no authority for withholding personnel files. In *Lyon v. Bankers Life & Cas. Co.,* this Court noted that "[t]he district court in the Western Division of the District of South Dakota has traditionally and uniformly allowed discovery of personnel files in insurance bad faith cases."[89]  "Personnel files may reveal an inappropriate reason or reasons for defendant's action with response to plaintiff's claim or an "improper corporate culture."[90]  "Personnel files may reveal whether a particular employee was rewarded financially for denying a certain number or percentage of claims or achieving a particular outcome with regard to claims handling."[91]

**Discovery of personnel files does not unduly invade privacy of employees.**

Zurich says discovery will invade the privacy of the employees. But the stipulated protective order requires that plaintiff maintain confidentiality.[92] South Dakota courts hold that such an order adequately protects privacy interests.[93]

**Zurich withholds the files of 11 individuals directly involved in this claim**

Zurich limits production to 3 employees, even though 14 individuals took part in Joe's

---

[89] *Lyon v. Bankers Life and Cas. Co.,* 2011 WL 124629 at *8,  (D.S.D. 2011); *Gowan v. Mid-Century Ins. Co.*, 309 F.R.D. 503, 512-13 (D.S.D. 2015); *Burke v. Ability Ins. Co.,* 291 F.R.D. 343, 352 (D.S.D. 2013).

[90] *Signature Development, LLC., v. Mid-Continent Casualty Company,* 2012 WL 4321322 at *13 (D.S.D. 2012).

[91]  *Anspach v. United of Omaha Life Insurance*, 2011 WL 3862267 * 9-10 (D.S.D 2011) (Duffy, MJ).

[92] See Doc. 19, filed 10/07/15.

[93] *See Gowan,* 309 F.R.D. 503, 516 (D.S.D. 2015); *Kirschenman  v. Auto Owners Ins. Co*., 280 F.R.D. 474, 490 (D.S.D. 2012), adopted by 2012 WL 1493833 * 11 (D.S.D.. 2012).

claim.[94] Zurich produced nothing for the other 11 persons. Some of them played important roles.

For instance, claim manager Cheryl Tague authored the claim note asking *"[w]hat was defense*

*counsel's reason that we could face a bad faith claim?"* [95]

### Zurich withholds files for individuals in the chain of command.

The Request seeks to trace Zurich's target and bonus system up the chain of command to

show the extent of management's involvement. Zurich says the information is irrelevant. The

courts disagree.[96] In *Hurley v. State Farm*, Judge Schreier explained:

> It is well established in this district that information about bonuses and incentives *for upper-level employees* is generally discoverable in cases alleging that an insurance company acted in bad faith in denying an insured's claim in violation of South Dakota law. (Citations omitted)
>
> *                *                *
>
> ... the South Dakota Supreme Court has reasoned that it is necessary to show that a company policy or practice existed to sustain a punitive damages award against a company because it is the intent of the company's management, not its low-level employees, that is the critical factor in the punitive damages analysis (citations omitted).[97]

The Court elaborated in *Hill*, saying "incentives and disincentives placed upon claims

handlers by those higher up in the chain of command ... would tend to affect decisions the claims

handlers make in individual claims. ... *it would be entirely rational to suppose that such*

---

[94] Ex. 54.

[95] Ex. 47.

[96] *Fair v. Royal & Sun Alliance,* 278 F.R.D. 465 (D.S.D 2012)(supervisors' scorecards relevant to plaintiff's theory that defendants brought institutional pressure to bear on employees to deny claims[.]"); *Kirschenman,* 280 F.R.D. 474, 485-86 (DSD 2012); See *Nye v. Hartford Acc. & Indem. Co.*, 2013 WL 3107492 at *11-12 (D.S.D. 2013); *Hill v. Auto Owners Ins. Co.,* 2015 WL 1280016 * 11 (D.S.D. 2015).

[97] *Hurley v. State Farm Mut. Auto Ins. Co.*, Civ. 10-4165-KES, 2012 WL 1600796 * 4 (D.S.D. 2012).

16

*motivational pressure brought to bear on the head of a department would be passed on to those*

*employees in his or her supervision. ...*"[98]

███████████████████████████████████████████

███████ Zurich itself says the purpose of the STIP bonus program is to support achievement of

management's targets for operating profits.[99] That provides a nexus justifying discovery of

management incentives and pressures.

**The Request is not overly burdensome.**

The number of individuals in the chain of command between adjuster and the head of

claims is typically limited. As explained by Judge Duffy in *Hill*:

> In the Fair case, there were only three employees in the chain of command between the
> head of the claims department and the claims handler, undermining any claim of
> overbreadth or undue burden. *Fair*, 278F.R.D. at 474-76. Furthermore, the Hills are
> entirely correct to point out that the higher up the chain of command one finds evidence of
> improper intent, the greater the likelihood that the decisions made in the Hills' case were
> the result of company policy or custom, which in turn bears on punitive damages. See
> *Roth*, 2003 S.D. 80, ¶ 50, 667 N.W.2d at 666.[100]

**Zurich unilaterally restricts discovery to 2008-2012.**

Zurich restricts production to the period when Joe's claim was pending. South Dakota

District Courts compel discovery of personnel files without date restrictions.[101] In *Hill*, Judge

Schreier explained that:

---

[98] *Hill v. Auto Owners Ins. Co.,* 2015 WL 1280016 * 8 (D.S.D. 2015).

[99] Ex. 7, 2016 Annual Report p. 80.

[100] *Hill v. Auto Owners Ins. Co.,* 2015 WL 1280016 * 8 (D.S.D. 2015).

[101] *See, e.g.. Burke,* 291 FRD 343, 351-352 (D.S.D. 2013)(ordering production without time
limitation): *Kirschenman,* 280 F.R.D. 474, 482-83 (D.S.D. 2012)(same); *Nye,* 2013 WL
3107492 * 11-12, Civ. No. 12-5028 (D.S.D. 2013) (Duffy, MJ) (same).

> ... because plaintiffs' claim alleges a practice or policy of minimizing claims, evidence supporting that claim may well be found in documents outside the period when plaintiffs' specific claim for benefits was being handled. *See* 8 Wright and Miller § 2008.5 (citing *Oppenheimer Fund*, 437 U.S. at 352) ("[O]lder information may often be relevant to the issues presented in a case.").[102]

Personnel files are self limiting – they begin with when the employee is hired and end when the employee leaves. They contain information relevant to the employee's training, qualifications, job duties, pay and promotions. Imposing *date restrictions* merely obscures the full picture of that individual's employment with the defendant.

Zurich's conduct before and after this claim is relevant to punitive damages. South Dakota pattern jury instructions  require the jury to consider "whether the conduct involved repeated actions or was an "isolated incident," and "the possible harm to other victims."[103] That means the *duration* of conduct is important. Conduct that began *a decade* earlier may justify larger penalties than conduct began a week earlier.

Subsequent events are also relevant because a primary purpose of punitive damages is to deter similar conduct in the future. If the conduct continues, it is more likely to cause harm to other victims, which may support a larger penalties. *See Schaffer v Edward D. Jones & Co*, 1996 SD 94, ¶ 35 (testimony that company personnel saw nothing wrong with their actions and intended to keep right on doing it supported a large punitive damage verdict).

Zurich is wrong to argue that discovery must be confined to the precise period that plaintiff's was pending. The jury *must* consider pre and post-claim conduct if it is to follow the

---

[102] *Hill*, 2015 WL 2092680, at *15 (D.S.D. 2015)*.*

[103] SDPJI Civil (2008) with 2015 revisions, 50-100-10.

Court's instructions.[104]

Plaintiff asks for an order compelling personnel files for each individual involved, and those in the chain of command above them.

**Request No. 4 -- Compensation records**

Documents sufficient to show all compensation (see definitions) paid to any of the individuals described in Request No. 2.  The scope of this request is January 1, 2002 to present.

This request seeks information concerning actual compensation paid to the individuals involved in the claim, and those in the chain of command above them. Zurich restates the same objections it made to regarding personnel files. Zurich then says "without waiving the objections, see compensation information attached as Zurich 2413-2420."

That 8 page document is not responsive to the Request.[105] It provides a general summary of compensation and benefits available to all low level employees, but doesn't identify actual compensation paid to anyone.[106]

South Dakota courts allow discovery of compensation paid to employees.[107]  Zurich does not explain its objections, nor how they trump South Dakota law.

Plaintiff seeks an order requiring production of the actual compensation information paid to the individuals involved and those in the chain of command.

---

[104] *Id.*

[105] Ex. 13.

[106] *Id.*

[107] *E.g., Hill,*  2015 WL 2092680, at *15; *Nye,* 2013 US Dist. LEXIS 85299, **30-33.

**Request No. 5 -- Employee expectations concerning compensation**

> All documents made available to inform any of the personnel described in Request No. 2 of the manner in which they can expect to earn increases in compensation, or the manner in which they are evaluated for compensation. The scope of this request is January 1, 2002 to present.

Zurich says the request is irrelevant and overbroad. Then Zurich refers to the performance evaluations produced in response to Request 2. ██████████████████ provide no information whatsoever about Zurich's compensation system.[108]

Zurich's Annual Reports, found by plaintiff's counsel on-line, say that Zurich has both a short-term incentive plan (STIP) and a "Long Term Incentive Plan" (LTIP).[109] STIP pays cash bonuses to lower level employees, and company executives are eligible for both the STIP and LTIP.[110]

The Annual Report also discloses that Zurich has a *"Remuneration Committee,"* which creates *"Remuneration Rules,"*[111] as well as *"target distribution and pay out guidelines:"*

> At the beginning of the year each individual jointly, with his or her line manager, defines and agrees on annual objectives. The individual performance achievements are then assessed during and at the end of the year through the Group performance management process. This process utilizes a rating scale between 1 and 5, with 5 being the highest rating. *There is a target distribution and payout guideline for each of the ratings.*[112]

---

[108] Ex. 12.

[109] Ex. 7, pp. 80, 87.

[110] *Id.*

[111] Ex. 7, pp. 50, 82.

[112] Ex. 7, p. 88.

20

Where are these materials? Zurich provided none of them. Plaintiff asks for an order

compelling Zurich to comply.

### Request No. 6 -- Claim payouts and compensation

All documents which would reflect that the amount paid in claims, is or has been considered in any manner when evaluating any of the compensation provided to any of the personnel described in Request No. 2, whether it be through average claim costs, loss ratios, combined ratios, underwriting profit, or any other metric. The scope of this request is January 1, 2002 to present.

Zurich doesn't object. It merely says it has "none." That is false. Here is an excerpt from

performance evaluations produced by Zurich:

WC Measurement of Success: We will use a basket of key metrics to judge each office's success in its technical performance. The basket will consist of: Average Cost per closed claim (Med Only and Lost Time) ... Average TTD Days, ... .[113]

The same performance evaluations show targets for claim payouts and claim closures.[114]

Zurich's 2016 Annual Report describes how the STIP links pay to performance targets.[115] The

following are just a few of the many examples:

"Zurich has a clearly defined global performance management process which ... *links individual pay with business and individual performance.*"[116]

*                    *                    *

"Expected performance is clearly defined through a structured system of performance

---

[113] Ex. 12. (emphasis added).

[114] *Id.*

[115] Ex. 7, p. 80.

[116] Ex. 7, p. 82 (emphasis added).

management *and this is used as the basis for remuneration decisions*."[117]

* * *

" ... the key focus throughout STIP is to support the achievement of the BOP targets."[118]

Defendants will try to hide behind the corporate veil to distance themselves from statements of the parent company, Zurich Insurance Group. But the parent company emphasizes that *claim processes* and *compensation programs* are standardized across the Group,[119] and [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[117] *Id.* at 82.

[118] Ex. 7, p. 80.

[119] Ex. 5, pp. 12, 44, 119.

[120] Ex. 13.

Plaintiff need not "pierce the corporate veil" to █████████████████████

████████████████████████████████████████████████████████████

Nor does plaintiff have to pierce the corporate veil to seek discovery related to those facts.

Moreover, documents *produced here by defendants* show that Zurich withholds

responsive documents, ███████████████████████████ "Remuneration

Rules" governing compensation,[122] and "target distribution and payout guidelines" listing

bonuses employees can earn.[123] Finally, it withholds the formal incentive plan documents

themselves.

These are just examples. Plaintiff requests an order requiring Zurich to produce all

responsive documents.

**Request No. 7 -- Officer & Director compensation**

> The Supplemental Compensation Exhibits provided to state regulators showing
> the compensation of your officers and directors. The scope of this request is
> January 1, 2002, to present.

Zurich's Response says that "Zurich did not file any supplemental compensation exhibits

in South Dakota for the years referenced." That dodges the request. It says nothing about

supplemental compensation exhibits *filed in South Dakota*. Compensation exhibits are filed in an

---

[121] Ex. 55.

[122] Ex. 7,  p. 82.

[123] Ex. 7, p. 88.

insurer's domiciliary state.[124] For Zurich American Ins. Co., that is New York.

The compensation of executives at Zurich is relevant for the same reasons that ███████ ███████████████████████████████ is relevant. When management receives bonuses for meeting targets set for operating profits, ████████████████████████████████████ ███████████████████████ In *Hill*, the Court noted:

> ... incentives and disincentives placed upon claims handlers by those higher up in the chain of command ... would tend to affect decisions the claims handlers make in individual claims. ... *it would be entirely rational to suppose that such motivational pressure brought to bear on the head of a department would be passed on to those employees in his or her supervision*. ...[125]

Management's bonuses are also relevant to punitive damages, because a jury shouldn't be required to determine a dis-incentive without knowing the size of the incentives already in place.

The Request only asks Zurich to provide copies of documents already filed with state regulations. Plaintiff asks for an order requiring Zurich to comply.

**Request No. 8 -- Goals, targets, objectives**

> All documents relating to goals, targets, or objectives set for any of the individuals described in Request No. 2, or for worker's compensation claims in general. The scope of this request is January 1, 2002 to present.

Zurich's Response says, "See the performance evaluations produced in Response to Request for Production No. 2, Zurich 2160-2412," which is limited to 3 people. Zurich doesn't actually object to the Request – it simply fails to comply.

---

[124] Ex. 56

[125] *Hill v. Auto Owners Ins. Co.*, 2015 WL 1280016 * 8 (D.S.D. 2015).

Zurich's response fails in several respects. *First*, the Request seeks the goals, targets, or objectives for the individuals involved in Joe's claim, and those in the chain of command above them. Zurich provided performance reviews for only three of 14 individuals involved, and none for those in the chain of command above them.



*Finally*, Zurich ignores the time scope of the Request. The request seeks documents from 2002 forward.  Zurich unilaterally limited the scope to 2008 through 2012. As already discussed,

---

[126] Ex. 13, at Zurich 2414.

[127] Ex. 12, at Zurich 2177, 2196.

[128] Ex. 55.

[129] Ex. 12, at Zurich  2213.

the duration of Zurich's conduct is relevant to both intent, and to punitive damages.

Plaintiff asks for an order requiring Zurich to produce all documents relaing to the goals and targets described in the request.

### Request No. 10 -- Claim Manuals – Procedure Guides

All documents used, or available for use by any of the individuals described in Request No. 2 to assist, or guide them in handling workers compensation claims or supervising those who handle claims. This includes but is not limited to claim manuals, "Best Practice" guides, procedure guides, operation manuals, supervision manuals, workshop materials, bulletins or memos, or management directives in any form. The scope of this request is January 1, 2002 to present.

In response, Zurich produced ██████████████████████████████████ ██████████████████████████████████████ But inspection reveals that Zurich withholds many other important documents.



---

[130] Ex. 57.



Plaintiff requests an order compelling these materials and any other documents responsive to Request 10.

### Request No. 11 – Training for Handling Worker's Compensation Claims

> Documents sufficient to identify all training materials, or educational materials related to handling workers compensation claims, and made available to any of the persons described in Request No.2  since January 1, 2005.

Zurich's responses is "See the documents produced in Response to Request No. 10," █████████████████████████████████████████████████ Those documents are partially responsive to Request11, but miss the essential point of the request.

First, this request involves training/educational materials, not procedure guides.

Second, it doesn't necessarily call for *actual production* of training or educational materials. It merely asks for *"documents sufficient to identify"* those materials. Thus, plaintiff seeks listings or indexes allowing plaintiff to *identify* relevant training materials and then narrow

---

[131] *Id.*

27

the information sought before requiring Zurich to actually produce them.

Zurich possesses many training documents. Zurich's website describes some of the training given to claim personnel:

> Your Claims career begins in your home office with a structured training plan, working with the local manager and team, as well as classroom training at our home office in Schaumburg, IL. Throughout your training, you will progressively build your skills as you are introduced to more complex claims, case studies and skill-building exercises that help you understand how to work both internally and with our customers."[132]

Zurich has numerous other materials. The claim notes here refer to "*the South Dakota training booklet that Dan Ashmore provided* when he came to the office [outlining] what constitutes bad faith."[133]



Zurich also has a program called "Zurich University."[135]

t's highly unlikely that "Zurich University" has no list of courses offered.

---

[132] See https://www.zurichna.com/en/careers/training-programs

[133] Ex. 47.

[134] Ex. 57.

[135] Ex. 58.

[136] *Id.*

28

Plaintiff asks for an order compelling Zurich to comply.

**Request No. 12 — Prior testimony**

> All deposition or trial testimony transcripts of any of your officers, or any of the persons described in Request No. 2, in any extra-contractual suit arising out of the handling of a worker compensation claim. The scope of this request is January 1, 2002 to present.

Zurich's Response simply says "the requested data is not tracked." But the request doesn't ask whether Zurich "tracks" the testimony. If Zurich has responsive materials in its possession, custody, or control, the Rule requires Zurich to produce them.[137]

In a published interview, Zurich's General Counsel Jack Kerrigan, explains that Zurich's electronic system captures information about every piece of litigation against the company, and says "it's all digital and all available:"

> Electronic matter management, Kerrigan says, is essentially a knowledge management system that captures a great many facts about every piece of insurance litigation that the company has been involved in— the internal unit within Zurich North America that was involved, the nature of the claim, the legal issues, and so on.

> "Now when we encounter a claim, we can go back and see if we've ever had a similar matter before and what the issues were and what the result was," he says. "It's all digital and all available." [138]

---

[137] *See, e.g., Lillibridge v. Nautilus Ins. Co.*, 2013 WL 1896825, *8  (D.S.D. 2013); *Beyer v. Medico Ins. Group*, 266 F.R.D. 233, 338 (D.S.D. 2009).

[138] Ex. 59.

Kerrigan also confirms that Zurich tracks and rates outside counsel hired in every case.[139]

Thus, even if his statement that "it's all digital and all available" is an exaggeration, Zurich can

still contact outside counsel for copies of transcripts, and courts in this jurisdiction require

companies to do that if necessaary to comply with requests for prior testimony.[140]

The information is relevant. *In Lyon,* this Court gave a list of reasons:

- it "materially eases the tasks of courts and litigants and speeds up what may otherwise be a lengthy process."

- the information is readily available to defendant, while the piecemeal process of plaintiff gathering it would be difficult and costly, which is contrary to the "just, speedy, and inexpensive determination of every action . . . ."

- It may reveal similar events of claim processing by this defendant.

- It may lead to discovery of prior adverse rulings against this defendant on the same issues being disputed in this case.

- It may reveal prior declarations by defendant's personnel on facts or issues regarding the interpretation of claims manuals, other claims protocol, bonus or award programs, or claims quality assurance.

- It may reveal internal procedures relevant to handling similar matters.

- It may reveal prior cross-examinations of employees disclosed as witnesses in this action.[141]

Plaintiff's Request 12 is not unduly burdensome. It is limited to testimony in extra-

---

[139] *Id.*

[140] *Beyer,* 266 F.R.D. 333, at 338; *McElgunn*, 2008 WL 2717872, ** 2-4.

[141] *Lyon*, 2011 WL 124629 * 12-13.

contractual suits (1) by officers of the company or any of the individuals identified in Request 2; (2) arising from work comp claims; and (3) since January 1, 2002.

This Request is unlikely to involve dozens of depositions. Plaintiff's counsel has deposed hundreds of company personnel, and most report no prior testimony. Those that do, typically haven't testified often. This reveals yet another way to identify prior testimony of these individuals – *ask the individuals themselves.* Zurich makes no effort.

### Request No. 16 -- Newsletters

> All company newsletters available to the worker's compensation claim personnel involved in handling or supervising Plaintiffs claims since January 1, 2005.

Zurich's *uncertified* obejections say: "This Request is overbroad, vague, burdensome, and the information sought does not appear reasonably calculated to lead to the discovery of admissible evidence. In addition, there are no newsletters dedicated solely to worker's compensation issues." Zurich also objects to producing newsletters after the 2013 WC settlement. Without waiving the objection, Zurich claimed it would gather the newsletters and supplement its Response.[142] That was months ago. Zurich still hasn't produced any newsletters.

Zurich objects to relevancy. But Zurich ignores prior rulings from this Court saying just the opposite.[143]

---

[142] Ex. 1.

[143] *Brown Bear v. CUNA Mutual Inc. Soc.*, 266 F.R.D. 310, 324 (D.S.D. 2009) (Company newsletters discoverable in bad faith actions); *Kirschenmann,* 280 F.R.D. 474, 487

Newsletters expedite and streamline discovery. They discuss education, training, and resources available to personnel, and reveal the actual names used by the company for various departments, positions, procedures, compensation plans, programs, initiatives, and other matters concerning company operations. That allows plaintiff to tailor narrow discovery requests using specific names rather than abstract descriptions. It allows defendant to readily identify and gather responsive documents, and restricts false claims that the information doesn't exist. In short, newsletters allow plaintiff to shoot with a rifle instead of a shotgun.

Zurich says "there are no newsletters dedicated solely to worker's compensation issues." But the Request doesn't seek newsletters dedicated <u>solely</u> to WC issues. It seeks newsletters available to the personnel involved in handling or supervising plaintiff's. Those materials will contain information pertinent to those personnel – otherwise, why would Zurich make the newsletters available to them?

The Rules require a party to respond to requests as actually stated, not what the party wants it to say. We ask for an order requiring production of newsletters as stated in the request.

---

(compelling discovery of company newsletters in bad faith actions).

**Request No. 17 -- Training on Duties of Good Faith**

All documents made available to train, guide, or assist any of the individuals
described in Request No.2 with respect to:
      a. Unfair claims practices;
      b. Good faith or bad faith claim handling;
      c. Wrongful claims handling;
      d. Extra contractual suits or damages;
The scope of this request is January 1,2002 to present.

Zurich's Response says: "See the documents produced in Response to Request No. 10."

██████████████████████████████████ A word search of the documents Zurich

produced show that none of them mention unfair claim practices, good faith, or bad faith. Nor do

they discuss those subjects using synonyms of those terms.

Zurich's purported inability to locate any documents with these terms is inconsistent with

General Counsel's description of the electronic universe of data at Zurich's fingertips. Zurich's

website shows its elegant, 783,800 square foot. cantilevered headquarters situated on 40 acres in a

Chicago suburb, that cost $400 million to build in 2016, and includes an indoor waterfall with a

forest on the roof for employees to stroll through on their lunch break. It says Zurich employs

3000 people in Illinois, and insures 90% of Fortune 500 companies.[144] Surely a company with that

level of sophistication has at least a few scraps of paper discussing its duties of good faith/bad

faith.

---

[144] https://www.zurichna.com/

Indeed, Zurich's response contradicts its own claim notes in this case, referring to "the South Dakota training booklet that Dan Ashmore provided when he came to our office [which] outlines what constitutes bad faith."[145]

Its unlikely that Rapid City attorney Dan Ashmore's booklet on bad faith is the *only* resource Zurich has discussing the duties of good faith owed to Joe and other injured workers. But Zurich didn't even produce that.

Plaintiff requests an order requiring production of training/educational materials concerning Zurich's duties of good faith as sought by Request 17.

**Request No. 19 – IME Procedures**

All documents available to any of the individuals described in Request No.2 relating to:

    a. the purposes and benefits of obtaining IME services;

    b. the criteria and method for deciding when to seek IME evaluations;

    c. the criteria and method for deciding who to select as an IME provider;

    d. the criteria and method used to verify credentials of IME providers;

    e. the methods and criteria used to verify that the examiner is truly independent.

The scope of this request is January 1,2005 to present. This request does not include documents from individual claim files.

---

[145] Ex. 47.



[redacted] Zurich produced nothing dealing directly with IME procedures.

Before discussing what Zurich withholds, [redacted]

[redacted]' to the purpose authorized by SDCL 62-7-1. It says:

> "The examination shall be for the purpose of determining the nature, extent, and probable duration of the injury ... and ... ascertaining the amount of compensation which may be due ... ."

[146] Ex. 60.

[147] *Id.*

The legislature authorized IMEs so that insurers could investigate the facts. Under South Dakota law, worker's compensation insurers have a duty to investigate claims and subject the results of that investigation to a reasonable evaluation.[148] An investigation that focuses on finding reasons to deny, while ignoring reasons to pay, isn't a reasonable investigation.[149] An evaluation that views an IME report as an automatic trump card regardless of contrary facts or medical opinions isn't a reasonable evaluation.[150]

In *Mordhorst*, the SD Supreme Court recently held that an insurer commits bad faith when it denies a worker's compensation claim based on an IME the insurer knows is biased.[151] Similarly, the Eighth Circuit affirmed a SD bad faith verdict in *Athey v. Farmers Ins. Exchange*, based in part on the insurer's selection of a biased IME physician.[152]

Zurich withholds numerous responsive documents. The request asks for IME guidelines related to the purpose, benefits, criteria for obtaining and determining selection of providers, credentials of providers, and independence of providers. █████████████████████████

████████████████████████████████████████████

---

[148] *Champion v. US Fidelity & Guar. Co.,* 399 N.W.2d 320, 323 (S.D. 1987); *Eldridge v. Northwest G. F. Mut. Ins. Co.*, 221 N.W.2d 16, 21 (S.D. 1974).

[149] *Id.* at *4-7.

[150] See *Demetrulias v. Wal-Mart Stores Inc.*, 917 F. Supp. 2d 993, 1007 (D. Az. 2013)(using an IME as a "claim trimmer" is not a reasonable investigation).

[151] *Mordhorst v. Dakota Truck Underwriters et. al.,* 886 N.W.2d 322, 324-325 (S.D. 2016).

[152] *Athey v. Farmers Ins. Exchange,* 234 F.3d 357, 361 (8th Cir. 2000).

credible. Zurich handles *billions* of dollars in claims each year. It doesn't require each adjuster to reinvent the wheel for each IME. Nor does Zurich let front level adjusters invent their own IME procedures, or use guesswork to determine reasonable fees for IME services. It has lists of IME physicians and vendors, information collected from past experiences with them, the quality of their reports, and their fees. It most likely rates their performance, just as it does for each outside counsel.

Zurich also has policies and training concerning (1) when to seek an IME, (2) how to select a provider, (3) quality assurance procedures, (4) how much to pay, (5) cost/benefit measurements, and other aspects of the IME process.

We request an order requiring production of all IME procedures.

### Request No. 20 -- Blow and Farnham Reports

All IME or record review reports you obtained from either Dr. Jerry Blow or Dr Richard Farnham since January 1, 2000.

Zurich's uncertified objections state: "This Request is irrelevant, overbroad, vague, and the information sought does not appear reasonably calculated to lead to the discovery of admissible evidence. Further, this data is not tracked. Without waiving the objections, the IME reports from Dr. Blow and Dr. Farnham that pertain to Mr. Leichtnam were produced with Defendant's Initial Disclosures."

South Dakota federal courts do not agree with Zurich's objections. In *Gowan v. Farmers*

37

*Ins.*, Judge Duffy issued an order requiring production of Dr. Farnham's reports in other claims.[153] In *Hofer v. United Financial Services* (Progressive Ins.) Judge Schreier ordered production of all IME reports signed by three IME physicians,[154] and later imposed sanctions for failure to comply.[155]

Both the SD Supreme Court and the Eighth Circuit hold that use of biased IMEs as a device to deny claims will support bad faith liability.[156] The facts here show that Zurich decided Joe needed no further treatment, then went doctor shopping to find support, ignored its own IME, tried to get doctors to change wording of reports, and once it had Farnham's opinion, ignored seven contrary opinions and ended medical care.



Dr. Blow's reports are also relevant. When the first IME obtained from Dr. Wayne Anderson didn't support terminating medical care, Zurich hired Dr. Blow to challenge Dr.

---

[153] *Gowan,* 309 F.R.D. 503, 516-18.

[154] *Hofer, v. United Financial Casualty Co. d/b/a Progressive Northern Inc. Co.*, 4:15-cv-04181-KES, Doc. 26, 7/26/16 (D.S.D. 2016).

[155] *Id.*, Doc. 68, 4/28/17.

[156] See *Mordhorst, Athey*, *supra.*

Anderson's impairment rating.[157] Blow failed to accomplish that assignment, but there's more to the story.

Dr. Blow's credentials are similar to Dr. Farnham's. The South Dakota Supreme Court described his qualifications like this: "Dr. Blow had been unable to pass his board certification examinations on three occasions ... his only board certification was in independent medical examinations, a certification that involved a week-long course."[158]

In another decision rejecting Dr. Blow's opinions, the SD Department of Labor stated, "Dr. Blow's testimony hardly makes him appear as an impartial evaluator."[159]

In this case, Dr. Blow gave Zurich a report predictably assigning 50% of Joe's condition to pre-existing causes.[160] Zurich then tried to use that report to cut Joe's impairment rating benefits in half, but the SD Department of Labor directed Zurich's attention to the Supreme Court decision in *Orth v. Stoebner*, establishing that 50% meets the "major contributing cause" standard, and once that is met there is no apportionment.[161]  So Dr. Blow's report unwittingly cemented Zurich's responsibility.

---

[157] Ex. 31, at Zurich 95-96.

[158] *Peterson v. Evangelical Luther Good Samaritan Soc.*, 816 N.W.2d 843 (S.D. 2012).

[159] *Blanchard v. Millstone II, and Farmers Insurance,* 2014 S.D. Work. Comp. HF No. 81, 2011/12.

[160] Ex. 30.

[161] *Orth v. Stoebner Permann Const., Inc.,* 2006 S.D. 99 at ¶¶ 36-49.

Once Zurich got that news, it wanted Dr. Blow to change his report.[162] When that didn't happen, Zurich hired Farnham, who apportioned 76.3% to pre-existing causes in order to fix Blow's mistake.

Plaintiff believes that IME reports and other dealings between these doctors and Zurich will show Zurich's knowledge that these doctors almost always produce reports that support denial or limitation of benefits.

Cases undoubtedly exist in which treating doctors are wrong, but if an insurer knowingly hires a doctor that supports denial or reduced claim payments 90% of the time, the jury is entitled to know that too. Zurich instead wants the jury to believe that its relationship with these doctors is limited to Joe's claim. That perpetrates a fraud on the jury.

Plaintiff asks for an order requiring production of all reports in Zurich's possession issued by Farnham and Blow.

### Request No. 21 -- Blow and Farnham payments

> Documents sufficient to show the amount of payments you made to either Dr. Jerry Blow or Dr Richard Farnham, since January 1, 2000, as well as the Vendor Code used to identify each doctor. This request includes information concerning payments made to any third party vendor such as Alaris or Examworks for the services of either doctor.

Zurich's Response is "Objection. This Request is irrelevant, overbroad, vague, and the information sought does not appear reasonably calculated to lead to the discovery of admissible

---

[162] Ex. 31, at Zurich 92.

evidence. Further, this data is not tracked. Without waiving the objections, any such bills in Mr. Leichtnam's claims file were produced with Defendant's Initial Disclosures.

Zurich's claim that the information is not "tracked" is a word game if not an actual misrepresentation. ████████████████████████████████████████ The code for IME payments is 37 IME.[164]  The purpose of coding is to allow Zurich to search and retrieve the information. Zurich can also word search its expense records for the "vendor codes" or billing names used by these physicians.[165] It is required by law to file IRS 1099 reports on payments to these doctors, and can retrieve the information from its accounting records. It can also word search claim diary notes and claim files for the names of these doctors. In short, it has many ways of locating and producing this information.

As for Zurich's unsigned and uncertified relevancy objections, South Dakota's federal courts do not agree.[166] Compensation paid to these doctors, or expected future compensation, has implications for potential bias.

Plaintiff asks for an order compelling production of payment information involving these doctors.

---

[163] Ex. 61.

[164] Ex. 61.

[165] *Id.*

[166] *Gowan,* 309 F.R.D. 503, 516-18 (D.S.D. 2015); *Hofer,* 4:15-cv-04181-KES, Doc. 26, 7/26/16 (D.S.D. 2016).

**Request No. 22 -- IME Keyword Searches**

> All documents which include any of the following terms: "independent medical
> examination," "independent medical exam," "independent medical exams," or
> IME. This request does not include documents from individual claim files. The
> scope of this request is January 1, 2005 to present. This request is further limited to
> documents from any hard drive or other electronic storage media used, shared by,
> or accessible to any of the individuals referred to in Request No. 2, or by any
> company personnel involved in claim analytics.

Zurich's uncertified objection is: "This Request is irrelevant, overbroad, vague, and the
information sought does not appear reasonably calculated to lead to the discovery of admissible
evidence. In addition, this Request is unduly burdensome as it seeks documents not only from the
entirety of Zurich's record keeping systems but also from any "other electronic storage media
used, shared by, or accessible to any of the individuals."

This Court overruled relevancy and burden objections to key word search requests in *Lyon,*
saying that: "the use of specific words or key phrases in electronic searches of computerized claim
files has been approved historically in this district."[167]

The request is not overly broad or burdensome. The scope is limited by excluding
documents in individual claim files, which narrows the scope of responsive documents and aims
discovery at high level policies and procedures. The request is limited in temporal scope to 2005

---

[167]   *Lyon*, 2011 WL 124629, **10-11. Citing *McElgunn,* Civ. 06-5061 (Doc. 84, pp. 2-3)(D.S.D.
2007); *Brown Bear,* 266 F.R.D. 310, 322-323; *Burke,* 291 F.R.D. 343, 356 (D.S.D. 2013).

forward, and is further limited to documents (or electronic data) used, shared by, or accessible to any of the individuals referred to in Request No. 2 or by personnel involved in Claim Analytics.

Contrary to Zurich's objection, the request does not require Zurich to search the entirety of its record keeping systems. It is limited to information accessible to two categories of individuals: (1) the individuals referred to in Request 2 (personnel involved in this claim and the chain of command above them); and (2) personnel involved in "claim analytics."

By restricting the scope to individuals referred to in Request 2, plaintiff maintains a nexus between the information requested and the specific personnel in a position to impact claim handling procedures applied in this case.

Finally, Zurich falsely states that "claim analytics" means anyone involved in claims."[168] Zurich knows better. The terms "claim analytics" and "predictive analytics" are terms of art referring to Zurich's team of analysts that mine "big data" for information and create "predictive models" designed to increase profits. Zurich's website admits it has a "claims analytics team."[169]

████████████████████████████████████████

██████████████████

Zurich even posted a Youtube video explaining its "Claims Analytics Performance

---

[168] Ex. 1.

[169] Ex. 62.

[170] Ex. 62.

System,"(which it calls CAPS). [171] The video explains the direct connection between "claim

analytics" and Zurich's efforts to reduce claim payments, with the narrator saying "we really try to

control the average cost [of claims] because that's extremely key."[172]

   Plaintiff asks for an order compelling the IME word searches described in Request 22.

**Request No. 23 -- MMI keyword searches**

> All documents which include the terms "maximum medical improvement" or
> MMI. This does not include documents contained only in individual claim files.
> The scope of this request is January 1, 2005, or as far back as your information
> technology system allows you to locate documents containing search terms. This
> request is further limited to documents from any hard drive or other electronic
> storage media used, shared by, or accessible to any of the individuals referred to in
> Request No. 2, or by any company personnel involved in claim analytics.

Zurich's Response is "Objection. This Request is irrelevant, overbroad, vague, and the

information sought does not appear reasonably calculated to lead to the discovery of admissible

evidence. In addition, this Request is unduly burdensome as it seeks documents not only from the

entirety of Zurich's record keeping systems but also from any other electronic storage media used,

shared by, or accessible to the individuals referred to in Request 2, and is self limiting as it only

seeks information as far back as technology allows.

   Once again, courts in this jurisdiction routinely approve keywords search discovery in bad

---

[171] Zurich's YouTube video is available for viewing at the following web address:
   https://www.youtube.com/watch?v=qm--PKIpLzg

[172] *See* https://www.youtube.com/watch?v=qm--PKIpLzg , at 40 seconds into the video.

44

faith cases.[173]

Information showing how Zurich applies the concept of *maximum medical improvement* (MMI) is relevant here. Farnham and Zurich twisted the meaning of MMI to claim that since medical treatment <u>for pain relief</u> would not cure Joe's condition, it wasn't reasonable or necessary.[174] That argument is a common scam used by unethical insurers, but it is directly contrary to South Dakota law.[175]

The request is not overly broad. It requires Zurich to search for two phrases: "maximum medical improvement" and "MMI." It excludes claim files, because the search is not aimed at conversations about individual claims or claimants, but instead seeks higher level policy documents, training documents, and similar materials.

The request is limited in temporal scope, and is also self-limiting by seeking only that information that "your information technology system allows you to locate." It also limits the scope to electronic media accessible to personnel described in Request 2. By limiting the scope to January 1,2005, or as far back as your information technology allows you to locate documents containing search terms, the Request clarifies that no manual searching is required. South Dakota federal courts have recognized and approved of the self-limiting nature of this language, and

---

[173] See cases cited in footnote 162, *supra*.

[174] Ex. 43, p. 928-929;

[175] See Ex. 44 for worker's compensation decisions so holding.

compelled responses to similar requests.[176]

Zurich use of the MMI scam in this case deserves further investigation. Plaintiff asks for an order compelling the MMI word searches described in Request 23.

### Request No. 24 -- Rommesmo/Dakota Steel documents

> All documents related to the policy or policies issued to Rommesmo Companies and/or its successor companies, as well as all declarations or information related to terms and retention limits of that policy, the premiums assessed, the loss experience, and any special account status between you and Rommesmo Companies. This request does not include documents from individual claim files.

Zurich's Response is "A copy of the policy was produced previously as Zurich 1720-1768." Zurich neither complies with the request, nor states any objection to it.

The Request is not limited to the policy and nothing more. It specifically seeks all documents related to the policy or policies issued to Rommesmo. Zurich has documents showing communications with Rommesmo and/or Raffles concerning loss experience (claims), special account instructions, and WC matters generally.

Since Zurich makes no objection, objections are waived. But the information is relevant nonetheless. Documents already produced show that Rommesmo exerted influence to push Joe's claim toward closure. Rommesmo's Cayman Island work comp insurer coached Rommesmo to:

•   Be aggressive. Work with your adjuster to close claims as soon as possible (large or small).

---

[176] *Burke,* 291 F.R.D. 343, 356, citing *Lyon,* 2011 WL 124629, at *11.

- Be friendly but let them know you mean business when it comes to your bottom line.
- Remember, the door that squeaks loudest gets the oil![177]



Rommesmo has had other claims.[180] There will be a consistent thread of communications between Zurich, Raffles, and Rommesmo that extend well beyond Joe's claim file. If those materials show a pattern of efforts to limit claim payouts, thay are relevant to Joe's claim.

Plaintiff asks for an order compelling discovery of Zurich documents relating to contracts and communications with Rommesmo.

## CONCLUSION AND REQUEST FOR FEES AND COSTS

The concept of *stare decisis,* meaning *to stand by things decided,* plays a critical role in our courts and system of justice. As Benjamin Cardozo once noted:

> *The labor of judges would be increased almost to the breaking point if every past decision could be reopened in every case*, and one could not lay his course of bricks on the secure foundation of the courses laid by others who had gone before him."[181]

---

[177] Ex. 17.

[178] Ex. 12, Zurich 2247, 2305.

[179] Ex. 49.

[180] Ex. 8.

[181] (emphasis added) Benjamin N. Cardozo, *The Nature of the Judicial Process* (New Haven: Yale Univ. Press, 1921, p. 149).

By refusing to acknowledge precedent, and forcing the Court to issue rulings on matters of settled law, Zurich harms not only on the plaintiff but the civil justice system itself.

Discovery abuse is a winning proposition for Zurich, even if it loses this motion. Its objections already resulted in lengthy delays. And to stay within page limits and avoid requesting permission to file a much longer brief, plaintiff abandoned seven document requests altogether. Thus, Zurich won by default on seven requests just because of the sheer number of document requests it refused to comply with.[182]

If Zurich loses this motion, what has it lost?  It is merely required to do that which the law required in the first place. The matters Zurich attempts to obscure and deny ███████████ ██████████ add *billions of dollars* to Zurich's operating profits. The individual executives perpetuating these programs collect *millions in cash bounties every year.* The scale of these incentives make any sanction imposed here almost laughable, and meaningless as a deterrent.

Nonetheless, the Rules say attorney fees <u>shall</u> be imposed unless the losing party's objections were "substantially justified." FRCP 37(a)(4) and (5)(A), (B). In this case, even Zurich's own counsel avoids certifying the objections as justified under existing law.

Rule 37(a)(5) does <u>not</u> require bad faith or misconduct as a condition of shifting costs to the losing party. [183]  If a court grants a motion in part and denies in part, an award of fees is discretionary, and the Court may apportion fees. FRCP 37(a)(5)(C).

Plaintiff asks the Court to impose fees and costs necessitated by this motion.

---

[182] Plaintiff abandoned Requests 9, 13, 14, 15, 18, 25, and 26.

[183] *See* FRCP 37(a)(5), and *Rickels v City of South Bend*, 33 F.3d 785, 787-788 (7th Cir 1994); *DeVaney v Continental Am Ins Co*, 989 F2d 1154, 1161-1162 (11th Cir 1993).

Dated this 18th Day of December, 2017.

By: _____

Mike Abourezk
Dan Holloway
ABOUREZK LAW FIRM
P.O. Box 9460
Rapid City, SD 57709
Tel. (605) 342-0097 / Fax (605) 342-5170
Email:          mike@abourezk.com
                    dan@abourezk.com
Attorneys for Plaintiff

## CERTIFICATE OF COMPLIANCE WITH TYPE/WORD VOLUME

Plaintiff's counsel hereby certifies that Plaintiff's Brief in Support of Motion to Compel

Discovery is 11,869 words in length and as such does not exceed 12,000 words as required by Local

Rule 7.1 B.1.

Dated this 18th day of December, 2017.


By: _____
Mike Abourezk
Dan Holloway
ABOUREZK LAW FIRM
P.O. Box 9460
Rapid City, SD 57709
Tel. (605) 342-0097 / Fax (605) 342-5170
Email:  mike@abourezk.com
         dan@abourezk.com
Attorneys for Plaintiff

<div align="center">Certificate of Service</div>

The undersigned attorney hereby certifies that a true and correct copy of Plaintiff's

Brief in Support of Motion to Compel Discovery and Certificate of Compliance was

served on the following attorneys of record:

<div align="center">

J. Crisman Palmer
506 Sixth Street
PO Box 8045
Rapid City, SD 57709
cpalmer@gpnalaw.com

</div>

by hand delivery, on December 18, 2017 as well as electronically to the email address

above.

Dated this 18th day of December, 2017.

By: _____

Mike Abourezk
Dan Holloway
ABOUREZK LAW FIRM
P.O. Box 9460
Rapid City, SD 57709
Tel. (605) 342-0097 / Fax (605) 342-5170
Email:  mike@abourezk.com
         dan@abourezk.com
Attorneys for Plaintiff